563 A.2d 927

**Robert N. SPEISER, Appellee,**

v.

**J. Bernard SCHMIDT, Ann Schmidt, Merrill Lynch & Co., Inc., Dean Witter Reynolds & Co. and Capitol Life Insurance Company.**

**Appeal of J. Bernard SCHMIDT and Ann Schmidt.**

Superior Court of Pennsylvania.

Argued April 18, 1989.

Filed Aug. 24, 1989.

Reargument Denied Sept. 25, 1989.

---

David F. O'Leary, Harrisburg, for appellants.

Richard B. Wickersham, Harrisburg, for Speiser, appellee.

Before ROWLEY, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the final decree of the Court of Common Pleas of Dauphin County dated May 18, 1987, annulling various purchases, transfers of assets and the proceeds received therefrom by the appellants/J. Bernard Schmidt and Ann Schmidt as violative of the Uniform Fraudulent Conveyance Act (39 Pa.C.S. § 351 et seq.). We affirm.

The record reveals a plethora of loans, guaranties, promissory notes and transfers attendant to the operation and ultimate sale (through Bankruptcy Court) of Capital Bakers, Inc. In 1979, Capital Bakers was experiencing financial difficulty (losing money and in debt to several banks in the amount of roughly 4 million dollars).

For example, First Pennsylvania Bank had loaned some 3 million dollars to Capital Bakers, a transaction collateralized with Capital Baker's assets and 150,000 shares of Rite Aid stock belonging to a Ms. Lois Grass, valued at several million dollars. At this same time, First Pennsylvania Bank

had loaned $800,000.00 to the STN partnership (composed of J. Bernard Schmidt, Herman Timme (a general manager at Capital Bakers) and Norman Shea (an accountant at Capital Bakers and an agent for Ms. Grass)). The partnership was advanced money to purchase Capital Bakers' equipment, and, for tax purposes, had it leased back to the corporation. In return, First Pennsylvania Bank received 30,000 shares of Rite Aid common stock, again belonging to Ms. Grass, an investor in Capital Bakers who had loaned it over 9.3 million dollars since 1979.

When First Pennsylvania Bank made demand on the STN account, the appellant/Schmidt approached Ms. Grass. She declined to make payment on behalf of STN to forestall a default.

Also, in mid–1979, First Pennsylvania Bank was asking that its loan (4.2 million dollars) to Capital Bakers be immediately repaid. Efforts to locate another institution to finance repayment proved futile. It was only on the recommendation of one of the prospective banking lenders that the appellee/Robert N. Speiser was approached by the appellant/Schmidt and Ms. Grass, about November of 1979, to resuscitate an ailing business which he found to be "technically insolvent and under demand for repayment of all of its loans from major lenders." Thus, because Speiser was cognizant of Capital Bakers' precarious financial status, he agreed to take on the job of revitalizing the business and making it a going concern on the "guaranty" of the appellant/Schmidt that his salary of $175 per hour would be paid. As president of Capital Bakers, Schmidt had no inhibitions in doing so.

In 1980, through Speiser's efforts, Capital Bakers was refinanced by City Bank for some 4.5 million dollars.[1]  The

---

1. Just prior to refinancing, Capital Bakers' obligations were:
   1) 3.7 million dollars due First Pennsylvania Bank;
   2) Several hundred thousand dollars due Pennsylvania National Bank;
   3) A million dollars due trade creditors;
   4) Money due Speiser on his salary was about $250,000 by the end of May, 1980;  and

appellant/Schmidt executed a guaranty in favor of City Bank on May 30, 1980 for 3 million dollars. A second guaranty was also signed by him in favor of Citicorp Industrial Credit, Incorporated. There was a prior loan from Pennsylvania National Bank to Ms. Grass, who, in turn, loaned it to the corporation for operating capital. Additionally, by October of 1980, Bank Leumi had loaned monies to the corporation totalling approximately $695,000 with the transfer of Ms. Grass' Rite Aid stock used as security for the indebtedness as well as a promissory note executed by the appellant/Schmidt in favor of Bank Leumi for $65,000.[2] Lastly, another outstanding debenture on the corporation's books was in the name of Citibank and another of its entities, Citicorp.

In the course of the first few months of 1981, all loans were in default. Speiser, as general manager of Capital Bakers, asked that Ms. Grass' family assist in providing some interim funds to keep the business afloat.

Counsel for Ms. Grass considered the 4.3 million dollars in cash to Capital Bakers advanced by Ms. Grass not to be collateralized. She only received a pledge of assets from the appellant/Schmidt, but later, in a reconstruction of the loan, she received a "formal" guaranty from the appellant/Schmidt for the amount stated. See Exhibit #10. And, although the appellant/Schmidt testified otherwise, counsel for Ms. Grass had no knowledge of the guaranty being rescinded or revoked.

5) Obligations to Ms. Grass came to 4.3 million dollars reflected in the corporation's statement and evidenced by a note with the City Bank refinancing.

Ms. Grass elected to convert 3.6 million dollars of the debt owed to her by Capital Bakers into equity so as to give the corporation financial substance.

2. These monies were part of the capital obtained by the corporation in an effort to satisfy its indebtedness to Pennsylvania National Bank, which was replaced as a creditor, at the time, by Bank Leumi.

It must also be stated at this point that personal guaranties were issued by the appellant/Schmidt and Ms. Grass for monies owed to Speiser on the balance of his salary of $200,000.

On May 30, 1980, Capital Bakers owed the appellee approximately $251,000 in consulting fees. This amount was reduced by $51,000 when a portion of the proceeds from the refinancing by Citibank of New York and its affiliate Citicorp Industrial Credit, Inc. was used for repayment with $200,000 still outstanding. And, the amount stated was jointly and severally guaranteed by Schmidt and Ms. Grass. The repayment of Citibank and its affiliate was secured, in part, by Schmidt's personal guaranty.

With the refinancing of Capital Bakers, Citibank wanted Ms. Grass to convert into equity 3.6 million dollars of the debt owed to her by Capital Bakers. She did, and, as a result, Ms. Grass acquired stock in Capital Bakers which gave her controlling interest, and the indebtedness of Capital Bakers to Ms. Grass, guaranteed by Schmidt and his wife, was reduced from $4,134,679.38 to $532,679.48 as of May 22, 1980.

In September of 1980, Schmidt represented to Merrill Lynch, at the time of opening an account to invest his one-sixth ($\frac{1}{6}$) interest from the proceeds of the sale of a family owned corporation (Alto), that he was worth $800,-000. Of the $577,195.00 to be received by Schmidt from the Alto sale, $158,333 was paid to him on September 10, 1980, and the balance was paid on January 5, 1981.

In October of 1980, Herman Timme, with his discharge from employment with Capital Bakers, brought a breach of contract suit against the corporation, Schmidt and Norman Shea, alleging Schmidt's joint and several liability.

In late November or early December of 1980, Ms. Grass and her son made demand upon Schmidt to honor his personal guaranty of Capital Bakers' debt to Ms. Grass. Schmidt contacted the appellee about the incident, and the appellee said he would be meeting with the Grass family and would discuss the subject. However, he reminded Schmidt about the $200,000 promissory note of May 30, 1980, on which he guaranteed Capital Bakers' obligation to him.

On December 3, 1980, Schmidt was asked to resign from the corporation. As he stated, he was fearful for his future employment and the ability to provide for himself and his wife. This caused Schmidt to have various securities, valued at approximately $43,035.00, to be transferred to a new account (opened in his wife's name) with the Merrill Lynch firm. This was done, even though he owed "liabilities aggregat[ing] almost 6 million dollars as of December 8, 1980." See Trial Court's "Findings of Fact", Points 53 & 57. Additional securities were transferred from his account to his wife's on the same date, i.e., December 8, 1980, of approximately $67,475.00.

In January of 1981, First Pennsylvania Bank and Bank Leumi notified Capital Bakers that the loans to STN and the two loans (aggregating $650,000.00) to it were due and technically in default with a request for a moratorium on payment being denied. Id. at Points 60 & 61.

Despite the crumbling financial structure of Capital Bakers, Schmidt, on February 2, 1981, caused other securities to be transferred to his wife's Merrill Lynch account in the amount of $15,368.00. Likewise, during this very unstable financial period for Capital Bakers, no payments were made by Schmidt on the default declared by Bank Leumi on March 9, 1981, as well as First Pennsylvania Bank's similar declaration as to the STN loan, of which Schmidt was obligated to pay as a partner.

As stated by the trial court:

79. By March 1981, as Capital Bakers' precarious credit structure was collapsing, Schmidt knew or reasonably had to know, that he was likely to be called to honor his guarantees to M[s.] Grass, Plaintiff and Citibank, as well as his obligation to First Pennsylvania Bank, as an STN partner. Additionally, the Timme suit was still outstanding.

Nonetheless, Schmidt opened a new account at Merrill Lynch to transfer the $200,000.00 received from the balance of his share of the sale of the Alto Corporation. The money was given to Security First Group, an agent for Capitol Life

Insurance Company for the purchase of an annuity contract.

In the Spring of 1981, counsel for Ms. Grass demanded payment from Schmidt and his wife on their 1978 guaranty to pay 4.3 million dollars of the debts owed to Grass by Capital Bakers. Schmidt declined since he had just made large transfers of assets to his wife and he had purchased an annuity, all of which he believed was immune from reach. Further, Schmidt believed that the bankruptcy proceeding involving Capital Bakers extinguished his guarantees. The trial court thought otherwise and found as a fact that:

92. Between December 8, 1980 and March 9, 1981, Schmidt was insolvent within the meaning of the Uniform Fraudulent Conveyance Act, 39 Pa.C.S.A. § 351(1) as the present, fair salable value of his assets were less than the amount that would be required to pay his probable liability on his existing debts as they became absolute and matured.

93. Schmidt's transfers of property between December 8, 1980 and March 9, 1981, were made while he was insolvent or for the purpose of rendering him insolvent, in recognition of present and anticipated debts.

94. ...

95. On May 18, 1981, Plaintiff demanded payment by Capital Bakers and Schmidt as guarantor of the promissory note ... and all amounts due thereunder, amounting to $200,000 plus interest at 12%.... Capital did not pay and Schmidt refused to honor his guarantees.

To recoup the monies owed to him, Speiser filed suit in New York to have the matter arbitrated.[3] He was successful and sought enforcement of the out-of-state judgment in this Commonwealth in Dauphin County under Docket No. 1465–N–1984. Schmidt's efforts to contest payment produced a request for a preliminary injunction by the appellee. After

---

**3.** Initially, Speiser filed suit against Schmidt and Ms. Grass as co-guarantors of Capital Bakers' obligation. Speiser settled with Ms. Grass for $65,000.00.

a hearing thereon, the injunction was denied, but the trial court did find that Schmidt engaged in conduct violative of the Uniform Fraudulent Conveyance Act and directed that all transfers of assets made by Schmidt be annulled and the assets represented thereby be levied upon by the Sheriff of Dauphin County and the proceeds be disbursed to satisfy the appellee's claim. This appeal followed.

The appellants claim that the trial court erred as a matter of law in labelling certain transfers of stock and the purchase of an annuity policy as "fraudulent conveyances" proscribed by the Uniform Fraudulent Conveyance Act, and, thus, not exempt from the claims of their creditor/Speiser under state law.

In making our determination, we our guided by the language of the statute which forms the predicate for our inquiry and provides at § 354 that:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

39 P.S. § 354. Further, under the criteria set forth in the Uniform Fraudulent Conveyance Act, a person is insolvent if:

> ... the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on existing debts as they become absolute and matured.

Id. at § 352(2). Under Section 4 of the Act, 39 P.S. § 354, when the creditor establishes that the grantor was in debt at the time of the conveyance, the burden shifts to the grantee to establish, by clear and convincing evidence, either that the grantor was then solvent and not rendered insolvent by the conveyance, or that he received fair consideration for the conveyance. See *Stinner v. Stinner*, 300 Pa.Super. 351, 352, 446 A.2d 651, 652 (1982). Moreover, "where a husband conveys [property] to his wife or to his wife and himself as tenants by the entireties for a nominal

or inadequate consideration, at a time when the husband is insolvent or thereby rendered insolvent, the conveyance is presumptively fraudulent as to the husband's creditors." *First National Bank of Marietta v. Hoffines,* 429 Pa. 109, 115, 239 A.2d 458, 463 (1968).

Against the backdrop of that legal standard, we begin by observing that in December of 1980, Schmidt was no longer employed by Capital Bakers. At this same time, evidence showed that Schmidt signed a promissory note in May of 1980 to be obligated to pay Speiser's salary if Capital Bakers failed to do so, which at the time it was sought totalled about $200,000.00. In addition, Schmidt and his wife signed a guaranty in favor of Ms. Grass' agent (Norman Shea, who was acting on her behalf) to pay an amount determined to be at least $534,679.48, advanced to Capital Bakers to pay its expenses and for operating revenue, which had added to it another indebtedness of Capital Bakers to Ms. Grass aggregating 1.5 million dollars.

Schmidt's remarks as to the genuineness of his obligations, the former of which he stated he never expected to be "personally called upon to pay" and the latter of which he believed was "rescinded", were disbelieved by the trial court. The record being supportive of this determination by the trial court, we see no reason justifying a contrary holding.

As stated by the trial court, the combined liabilities of Schmidt came to "almost $6 million". Yet, during this period of time, Schmidt transferred over $125,000.00 from his personal account to an account in his wife's name at Merrill Lynch. This occurred despite the fact that he was aware that First Pennsylvania Bank and Bank Leumi were refusing extensions on loan payments for which Schmidt was a guarantor and that the nonpayment would result in default. When default was finally declared by First Pennsylvania Bank (on the STN loan), Bank Leumi (on Capital Bakers' failure to pay on two of its loans) and Citibank in the first three months of 1981, Schmidt opened a new

account with Merrill Lynch for $200,000.00 for the purchase of a Capitol Life annuity payable to himself and his wife.

In light of the outstanding liabilities of Schmidt, the "realities of the situation" lead us to conclude that the transfers made (in his name and that of his wife at Merrill Lynch) were done for the purpose of defrauding his creditors. And, the appellant's attempt to insulate such transactions under the cloak of 42 Pa.C.S. § 8124 is to no avail since they were made at a point in time when we find he was insolvent. See Id. at § 8124(b)(1)(viii); *Provident Trust Co. v. Rothman*, 321 Pa. 177, 183 A. 793, 797 (1936).

We have examined the record in a judicious fashion and found that in no sense can it be stated that Schmidt's assets exceeded his admitted liabilities at the time he made the transfers under scrutiny. In particular, it is interesting to note that prior to Capital Bakers filing for bankruptcy, the appellant stated he never thought of the possibility of being held accountable on his notes/guarantees. Notwithstanding such an allegation, for the reasons hereinstated, we join in the trial court's order revoking the various transfers and permitting attachment of the same for the satisfaction of the appellant's (J. Bernard Schmidt's) liability to the appellee.

Order affirmed.