In re Manuel KAPLAN, Debtor.

FIRST OPTIONS OF CHICAGO, INC., Plaintiff,

v.

Manuel KAPLAN, Defendant.

Bankruptcy No. 93–10625S.
Adv. No. 93–0507S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 26, 1993.

Gary A. Rosen, Gen. Counsel, Donald L. Perelman, Special Counsel, Philadelphia, PA, for debtor.

Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, Stephen P. Bedell, Timothy G. McDermott, Gardner, Carton & Douglas, Gen. Counsel, Chicago, IL, for First Options of Chicago, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Arising out of the instant individual voluntary Chapter 11 bankruptcy case of MANUEL KAPLAN ("the Debtor"), the owner of MK Investments, Inc. ("MKI"), a business engaged in trading on the Philadelphia Stock Exchange ("the PSX"), are two unrelated but equally substantial issues, both raised by FIRST OPTIONS OF CHICAGO, INC. ("Options"), a "clearing member" of the PSX which is easily the largest secured (over $400,000) and unsecured (over $5.6 million) creditor of the Debtor. These issues are (1) an objection to the Debtor's claimed exemptions, most notably his interest in MKI's pension plan ("the Exemption Issue"); and (2) an objection to dischargeability of (ultimately) $611,300 of the Debtor's indebtedness to it ("the Dischargeability Issue").

Resolution of the Exemption Issue requires us to interpret, as matters of first impression, a recently-amended Pennsylvania statute broadening exemptions for pension plans. We conclude that the Debtor is entitled to a full exemption of benefits from MKI's plan, at least pending any subsequent determination that the plan does not meet the necessary requirements of the Internal Revenue Code, 26 U.S.C. § 1, et seq. ("the IRC"), by the Internal Revenue Service ("the IRS") within 180 days from confirmation of a plan of reorganization in this case, principally because we find that the broad Pennsylvania statutory amendment does not require rigorous analysis of whether a plan would retain an exemption previously determined allowable under the IRC by the IRS. We do sustain Options' objection to the Debtor's attempts to claim New Jersey realty exempt by application of Pennsylvania law, as opposed to significantly different and applicable New Jersey law.

Resolution of the Dischargeability Issue requires us to revisit a difficult area of the law previously addressed by this court in In re Spector, 133 B.R. 733, 739–40 (Bankr. E.D.Pa.1991), i.e., whether a certain relationship (here, that of the principal of an insolvent corporation vis-a-vis the corporation's creditors) is an express trust relationship for purposes of the "fraud or defalcation" prong of 11 U.S.C. § 523(a)(4). As in Spector, we answer this question in the negative and therefore fail to find any portion of the Debtor's obligation to Options non-dischargeable. Alternatively, we find that a release in a work-out agreement between the parties effected a novation and eliminated the potential nondischargeable nature of the Debtor's prior obligations to Options.

### B. PROCEDURAL HISTORY

The Debtor filed the instant bankruptcy case on February 2, 1993. On May 20, 1993, Options raised the Exemptions Issue by filing Objections to certain exemptions claimed by the Debtor ("the Objections"). The Objections were initially listed for a hearing on June 16, 1993, which the parties agreed to continue until August 4, 1993.

In the meantime, on June 21, 1993, Options filed the above-captioned adversary proceeding attacking the dischargeability of a portion of its claim against the Debtor ("the Proceeding"). The trial of the Proceeding was also scheduled on August 4, 1993.

As a precursor to the proceedings on August 4, 1993, we received lengthy unsolicited Memoranda addressing the issue of the validity of the Debtor's claimed exemption of his pension plan from both parties on July 29, 1993 (Options), and August 2, 1993 (the Debtor). Unfortunately, our calendar of August 4, 1993, was very crowded, due to a planned vacation in the following week. The parties

therefore agreed to continue the hearing on the Exemption Issue and the trial of the Proceeding to be heard one after the other on September 23, 1993.

At a colloquy with the court and Options' counsel on August 4, 1993, the Debtor's counsel expressed an intention to file a dispositive motion in opposition to the Complaint in the Proceeding. We therefore established a schedule requiring that the dispositive motion, which ultimately took the form of a Motion to Dismiss the Complaint ("the Dismissal Motion"), and any supporting Brief, be filed by August 19, 1993, and that a reply be filed by Options on or before August 30, 1993. The Debtor was ultimately granted permission to file a counter-reply on or before September 7, 1993.

In the midst of this activity, the court, after a status conference of June 16, 1993, established September 1, 1993, as the deadline for the Debtor's filing a Plan of Reorganization and an accompanying Disclosure Statement in his main bankruptcy case. After the hearing and trial of August 4, 1993, were continued, the deadline for filing the Plan and Disclosure Statement was extended until October 29, 1993.

On September 13, 1993, this court entered an Order/Memorandum, reported at 1993 WL 367108 ("the Memo") denying the Dismissal Motion, but indicating that the Complaint contained certain deficiencies which Options could, at least in part, attempt to cure by filing an Amended Complaint on or before September 17, 1993, in order that an Answer could be filed thereto by the Debtor by September 22, 1993, just prior to the September 23, 1993, trial date. Options did file an Amended Complaint, confining its claim of dischargeability to $611,300 of the Debtor's obligation to it and broadening its

legal claims from reliance on the "fraud or defalcation" prong of 11 U.S.C. §§ 523(a)(4) and 523(a)(6), to invocation of 11 U.S.C. § 523(a)(2)(A) as well, which this court suggested might be appropriate if certain allegations in the Complaint could be proven at trial.

This court withstood a Stipulation presented to it by the parties on September 10, 1993, seeking a continuance of the hearing and trial, and both were in fact completed by the evening of September 23, 1993. Thereafter, we issued an Order of September 24, 1993, allowing the parties until October 1, 1993, to supplement their already-substantial pre-trial submissions. Both proceeded to file two Briefs each on that day, separately addressing the Exemption Issue and the Dischargeability Issue. We are therefore at no loss of written assistance from the parties, most of which has been skillfully and comprehensively presented, in deciding this matter.

Although the protagonists in both issues are the same, there is very little, if any, overlap of facts or law pertinent to resolution of the two issues in question. We will therefore proceed to first consider the Exemption Issue and then pass to separate consideration of the Dischargeability Issue.

## C. THE EXEMPTION ISSUE

### 1. PERTINENT FACTS

In his Schedule C, the Debtor elected to claim exemptions under 11 U.S.C. § 522(b)(2).[1] Specific property claimed as exempt, on the designated basis of § 522(b)(2) only, included: (1) art valued at $25,000; (2) a brokerage account valued at $41,647.00; (3) two condominiums located in Atlantic City, New Jersey, valued at $40,000 and $20,000, respectively; (4) furniture valued at $45,000; and (5) the Debtor's resi-

---

1. This Code section reads as follows:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in ... paragraph (2) of this subsection, ...

. . . . .

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been

located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place; and

(B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

dence in Penn Valley, Pennsylvania, valued at $800,000. Listed as exempt pursuant to 42 Pa.C.S. § 8124(b)(1)(ix) [2] are a pension plan valued at $589,833 and an individual retirement account (an "IRA") valued at $16,311.00.

Options' Objections, timely filed within thirty (30) days of the Debtor's April 20, 1993, meeting of creditors, see Federal Rule of Bankruptcy Procedure 4003(b), can be summarized as follows: (1) The Debtor's mere citation of § 522(b)(2) as a basis for many of the exemptions is not sufficiently specific; (2) the New Jersey condominiums are subject to New Jersey state exemption and entitles law, even though they are owned by the entireties with his wife and would be exempt if Pennsylvania state exemption laws applied to them; accordingly, they are not exempt from creditors of the Debtor only and can be sold by such a creditor (like Options) pursuant to 11 U.S.C. § 363(h); (3) the pension plan is not exempt under 42 P.S. § 8124(b)(1)(ix) because it has not been maintained in accordance with the IRC; (4) the pension plan may not be excluded from the Debtor's estate pursuant to 11 U.S.C. § 541(c)(2), as assumed by the Debtor; and (5) since the Debtor's wife is partially jointly liable on the Debtor's obligations to Options, the attempts to exempt the Debtor's entireties interest in his residence, furniture, art, and funds are not effective as to Options.

The record made on September 23, 1993, and the several Briefs of the parties address almost exclusively the exempt status of the pension plan. A few pages are devoted to the claims regarding the condominiums. The

Debtor's reference to § 522(b)(2) as the basis for his exemptions appears sufficiently specific, although references to subsections (A) (as to the pension plan and the IRA) and subsection (B) (as to the residence, furniture, art, and funds) would have been an improvement. To the extent that Options has not abandoned same, as it appears to us that it has, we conclude that Options has failed to meet its burden of producing evidence tending to establish that any of the Debtor's exemption claims, except those relating to his pension plan and his condominiums, are improper. Cf. In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3rd Cir.1992) (the burden of producing evidence in support of an objection to a creditor's claim initially rests on the objecting party).[3] We begin by addressing the issue to which the parties have given, by far, their most attention, the Debtor's claimed exemption of his pension plan.

The Debtor is the president of MKI, which was formerly a stock options trader on the PSX. MKI's predecessor was a partnership formed in 1981, MK Associates, Ltd. ("MKA"). The partners of MKA were the Debtor and Michael Becker, the latter of whom held a minority interest therein. In 1984, MKA was dissolved and was succeeded by MKI, a Pennsylvania Subchapter S corporation, which was then owned by both the Debtor and Becker. On November 30, 1986, Becker terminated his interest in MKI by selling his shares of stock to the Debtor, which left the Debtor as its sole shareholder.

While Becker was still a minority shareholder of MKA, the partnership sponsored a

---

2. This statute, added in 1990, reads as follows:

**(b) Retirement funds and accounts.—**
(1) Except as provided in paragraph (2) [relating to exemptions claimed inconsistent with a law inapplicable hereto], the following money or other property of the judgment debtor shall be exempt from attachment or execution on a judgment:

 . . . . .

 (ix) Any retirement or annuity fund provided for under section 401(a), 403(a) and (b), 408 or 409 of the Internal Revenue Code of 1986 (Public Law 99–514, 26 U.S.C. § 401(a), 403(a) and (b), 408 or 409, the appreciation thereon, the income therefrom and the benefits or annuity payable thereunder. This subparagraph shall not apply to:

(A) Amounts contributed by the debtor to the retirement or annuity fund within one year before the debtor filed for bankruptcy.
(B) Amounts contributed by the debtor to the retirement or annuity fund in excess of $15,000 within a one-year period.
(C) Amounts deemed to be fraudulent conveyances.

3. The Debtor briefly addressed the issue of whether his wife owes a debt to Options in his post hearing Brief by explaining that Options has a $346,342 judgment against the wife, see page 699 infra, which is on appeal and is fully secured by an appeal bond. Options never discussed the issue or presented any evidence rebutting the Debtor's assertions, and therefore we deem it to have abandoned same.

defined benefit pension plan ("the Plan") under § 401(a) of the IRC, effective January 1, 1984. The Plan documents were drafted by Steven J. Fromm, Esquire, an attorney specializing in pension and tax law who testified at trial. A favorable tax-qualification determination letter was received by MKA from the IRS on May 21, 1985. When it was formed, MKI succeeded MKA as the sponsor of the Plan. A second favorable tax qualification determination letter was received by MKI on September 2, 1986.

From the inception of the Plan, the Debtor and Becker were its sole participants. MKI had no other employees.

In the stock market crash of October 19, 1987, MKI suffered severe losses, and, as of November 30, 1987, the Plan was frozen. Since then, no additional benefits have accrued to the participants, and no additional contributions have been made by MKI. The Debtor, as the Plan's trustee, has continued to manage the assets of the Plan, has had annual actuarial reviews done of the Plan, and has filed all required tax returns for it.

In July, 1989, about two and a half years after he terminated his interest in MKI, Becker withdrew from the Plan. After adversarial negotiations with the Debtor, he received a lump sum distribution of $203,985, which purportedly constituted the sum of his accrued benefits to that date. As of the close of the last full plan year, November 30, 1992, the actuarial value of Debtor's accrued benefit in the Plan was $2,777.78 per month, and a total of $449,444.00. The value of the Plan's assets, mostly publicly-traded securities which fluctuate in price, was, as of November 30, 1992, $551,739.00.

The hearing of September 23, 1993, relative to the Exemption Issue consisted of expert testimony addressing whether the Plan (1) was within the scope of the Employment Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"); and (2) was qualified under the provisions of the IRC referenced in 42 Pa.C.S. § 8124(b)(1)(ix).

As one of its witnesses, Options called William S. Magargee, Esquire, the head of the employee benefits practice group at the local office of a large and prestigious law firm, Dechert, Price, and Rhodes, for the past ten years. Magargee testified that, since the Debtor, the general partner and owner of the Plan's sponsors; and Becker, who only worked a limited number of hours, were not "employees" of MKI and were the only parties able to receive benefits from the Plan, the Plan was not covered by ERISA.

Options also called Mitchell I. Serota, an actuary, who addressed the qualification of the Plan under the IRC. Initially, he pointed out that the IRS' favorable tax determination letter was conditional on the continued operation of the Plan in conformity with the IRC, as amended. He then launched into an analysis of several ways in which he believed that administration of the Plan had violated the IRC. Most of these centered around the fact that Becker received almost $204,000 as his distribution under the Plan, while Serota calculated Becker's maximum allowable distribution as about $110,000.

In rebuttal, the Debtor called Fromm, an attorney and certified public accountant who had set up the Plan and continued as the Debtor's counsel relevant thereto. Fromm stated that, while the IRS' determination letter was conditional, that was the only form in which such determinations were ever made. He further stated that all appropriate tax returns had been filed for the Plan, and that the Plan continued to qualify under the IRC, per the IRS. Fromm conceded that amendments were necessary to retain the Plan's favorable tax status in light of certain IRC amendments, but noted that the deadline for making these amendments had not passed, and that he believed that it was appropriate to wait in making the Plan amendments in order to incorporate any further IRC amendments therein.

When asked whether he believed that the Plan was ERISA qualified, Fromm claimed that it was, although without much apparent conviction. Fromm also conceded that he believed, at the time that the distribution made to Becker, it was "overly aggressive." However, he opined that this distribution, even if excessive, did not disqualify the Plan under the IRC.

2. THE DEBTOR'S PLAN IS NOT ERISA–QUALIFIED, BECAUSE NONE OF ITS PARTICIPANTS WERE OR ARE "EMPLOYEES" OF THE PLAN'S SPONSORS

In *Patterson v. Shumate*, — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Court held that the anti-alienation requirement of § 206(d)(1) of ERISA, 29 U.S.C. § 1056(d)(1), — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 constituted a restriction on transfer of pension plan funds which was enforceable under "applicable nonbankruptcy law." This holding had the effect of excluding any interest in benefit plans subject to ERISA from a debtor's bankruptcy estate, pursuant to 11 U.S.C. § 541(c)(2). The *Patterson* decision resolved a split in the Circuits as to whether the phrase "applicable nonbankruptcy law" in § 541(c)(2) referred only to state spendthrift trust law or also to federal law such as ERISA as well. It effectively overruled this court's decision that § 541(c)(2) referred only to state spendthrift trust law in *In re Atallah*, 95 B.R. 910, 913–19 (Bankr.E.D.Pa.1989).

■ However, despite the debtor-friendly result in *Patterson*, a plan must be ERISA qualified for a restraint on alienation to be enforceable under ERISA and thus for that decision to have any practical impact upon a debtor's pension plan. *See Patterson*, — U.S. at — – —, 112 S.Ct. at 2247–48; and *In re Hall*, 151 B.R. 412, 416–17 (Bankr. W.D.Mich.1993). This is so because the restraint on alienation contained in a non-ERISA plan is not enforceable under ERISA.

Although the Court, in *Patterson*, laid to rest the controversy over whether ERISA constituted "applicable nonbankruptcy law," the Court did not decide what types of pension plans constitute "ERISA qualified" plans. The court in *Hall, supra*, 151 B.R. at 417, found that both ERISA and the IRC must be reviewed to determine whether a particular pension plan is "ERISA qualified." In reaching that conclusion, the court stated that "[i]t seems clear from the term 'ERISA qualified' that ERISA establishes some criteria for qualification of pension plans. But, in fact, ERISA speaks of 'coverage' of pension plans and does not mention 'ERISA qualification.'" *Id.*

The IRC, on the other hand, establishes certain criteria for a pension plan to be "tax qualified." *See id.* at 418. Thus, in determining whether a Plan is "ERISA qualified," it may be necessary to discern whether a plan is "tax qualified" as well. On the other hand, it may only be necessary to ascertain whether the plan is covered by ERISA in determining "ERISA qualification."

> Arguably, the [*Patterson*] Court may have intended any one of three interpretations for the term "ERISA qualified" plan: (1) a plan subject to ERISA; (2) a plan subject to ERISA that contains an anti-alienation clause; or (3) a plan that is tax qualified under I.R.C. § 401(a), subject to ERISA, and has an anti-alienation provision as required by ERISA § 206(d)(1).

*Hall, supra*, 151 B.R. at 418.

In order to determine whether the instant Plan is "ERISA qualified," we do not believe that it is necessary for this court to ascertain whether the Plan is "tax qualified." This issue is discussed at pages 695–98 *infra* in determining whether the Plan is within the scope of 42 Pa.C.S. § 8124(b)(1)(ix). Our immediate task is to ascertain whether the instant Plan is covered by ERISA.

ERISA applies "to any employee benefit plan if it is established or maintained ... by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1). An "employee benefit plan" is defined, in part, as "an employee pension benefit plan." 29 U.S.C. § 1002(3).

> [T]he terms "employee pension benefit plan" and "pension plan" mean any plan ... which was heretofore or is hereafter established or maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, ...
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the

termination of covered employment or beyond....

29 U.S.C. § 1002(2)(A).

An elementary requirement of ERISA is "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan." 29 U.S.C. § 1103(c)(1). A "participant" is "any employee or former employee of any employer ... who is eligible to receive a benefit of any type from any employee benefit plan." 29 U.S.C. § 1002(7). "Reading these two sections together establishes that for a plan to be subject to ERISA, it must exclusively provide benefits to employees and former employees." *Hall, supra*, 151 B.R. at 420. It appears obvious that an ERISA qualified plan must, therefore, include employees.

An "employee" is defined under ERISA as "any individual employed by an employer." 29 U.S.C. § 1002(6). The Supreme Court has held that this "nominal definition of 'employee'" is supplemented by a traditional common-law test for determining who qualifies as an employee under ERISA. *See Nationwide Mutual Ins. Co. v. Darden,* — U.S. ——, ——, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992). In *Darden*, the Court stated as follows:

> we adopt a common-law test for determining who qualifies an "employee" under ERISA, a test we most recently summarized in [*Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166 [104 L.Ed.2d 811] (1989) ]:
>
> "In determining whether a hired party is an employee under the common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry is the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assis-tants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party." 490 U.S. at 751–752, 109 S.Ct. at 2178–2179.

In determining whether a worker is an employee, this court has, in the past, relied on the "common law definition of employees," as dictated by the applicable Treasury Regulation, 26 C.F.R. § 31.3121(d)–(c)(2). *See In re Compass Marine Corp.,* 146 B.R. 138, 147 (Bankr.E.D.Pa.1992); and *In re St. Joseph's Hospital,* 126 B.R. 37, 41 (Bankr.E.D.Pa. 1991), citing *In re Miller,* 86 B.R. 817, 820 (Bankr.E.D.Pa.1988). This court has also relied on a line of cases addressing the "common law definition of employees" as interpreted by the Pennsylvania courts. *See Compass Marine, supra,* 146 B.R. at 147–52; and *St. Joseph's Hospital, supra,* 126 B.R. at 41–42.

The "common law definition of employees" in both contexts applies a test similar to that contained in the Treasury Regulation for determining whether an employer-employee relationship exists. Common elements of each test are (1) whether and to what extent the employee is subject to the control and authority of the employer in regard to the work done and the manner of performing it; and (2) whether the individual has a proprietary interest in some business he can operate free from the control of the other individual. *Id.* In light of these interpretations, the term "employee" does not seem to encompass owners of, or investors in, a business entity, such as the Debtor and Becker.

In addition, the Department of Labor, which is authorized to promulgate regulations necessary to implement the provisions of ERISA, 29 U.S.C. § 1135, has, pursuant to this authority, narrowed the definition of "employee benefit plan" by (1) excluding from "an employee benefit plan" any plan under which "no employees are participants covered under the plan;" and (2) excluding from the definition of "employee" for purposes of this section "an individual and his or her spouse ... with respect to a trade or business, whether incorporated or unincorpo-

rated, which is wholly owned by the individual or by the individual and his or her spouse." 29 C.F.R. § 2510.3–3.

In its argument that the instant Plan is not ERISA qualified, Options relies on several post-*Patterson* cases which hold that, where a debtor is the owner and sole participant in a plan, that plan cannot be ERISA qualified because the debtor is not, in fact, an eligible employee. For example, in *In re Witwer*, 148 B.R. 930 (Bankr.C.D.Cal.1992), the debtor was the sole shareholder, president, and only employee of an incorporated medical practice. The court applied 29 C.F.R. § 2510.3–3 to the pension plan and held that it was not subject to ERISA. The court reasoned that the debtor was not a participant under ERISA because the regulation "unambiguously debars a sole shareholder from employee status." *Id.* at 936. Because the plan had no participants and did not meet the definition of "employee pension benefit plan," the *Witwer* court concluded that the plan in question could not be "ERISA qualified." *Id.*, citing 29 U.S.C. § 1002(2)(A).

The facts of *Witwer* can be distinguished from those of the instant case, however, because the instant Debtor was not the sole shareholder of the Plan's sponsor for the entire life of the Plan. MKI began business in 1981 as a successor to MKA, a partnership, of which the partners were the Debtor and Becker. The partnership created a defined benefit pension plan under § 401(a) of the IRC effective January 1, 1984. In December, 1984, the partnership was succeeded by MKI, a Subchapter S corporation of the Debtor. MKI succeeded MKA as the sponsor of the Plan. The only participants of this Plan were the owners of the Plan's sponsor, the Debtor and Becker. In 1986, over two years after the inception of the Plan, Becker terminated his interest, leaving Debtor as the sole remaining owner. Thus, for a period in excess of two years, the Debtor was not the sole shareholder of MKI. However, throughout the entire life of the Plan, either the Debtor and Becker were joint owners or the Debtor was the sole shareholder. Neither MKA nor MKI had any other employees.

In *Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993), another post-*Patterson* case, the court analyzed 29 C.F.R. § 2510.3–3 with regard to a group health insurance policy of a plan whose sole participants were a husband and wife who owned the plan sponsor. In doing so, the *Fugarino* Court determined that "a plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA." *Id.* at 185.

The instant facts can be distinguished from that of *Fugarino* only on the ground that, although the Debtor and Becker were the sole beneficiaries for most of the Plan's existence, they were not husband and wife. The issue that remains to be resolved is whether, because the Debtor and Becker were joint owners of the Plan sponsor, although not husband and wife, and the Plan sponsor employed no other people, the Plan fell outside of the scope of ERISA.

The Debtor argues that the instant facts are similar to the facts in *Patterson*. In *Patterson*, the debtor was the only remaining participant in the retirement plan at issue. All other participants had received distributions of their interests. —— U.S. at ——, 112 S.Ct. at 2245. The Court found the plan to be subject to ERISA despite the fact that the sole remaining participant was the debtor, who was also the president and chairman of the board of directors. Similarly, in this case, the only other participant of the Plan besides the Debtor was Becker, who held a minority interest from the inception of the Plan in 1984 until 1986.

However, several critical facts distinguish the facts of *Patterson* from those of this case. To begin with, the plan at issue in *Patterson* was not a single participant plan. Before the plan was terminated and liquidated, it had approximately over 400 participants. In this case, from the inception of the Plan until Becker terminated his interest, the Debtor and Becker were the sole participants in the Plan and the sole owners of the Plan sponsor. MKI had no other eligible employees. Second, and most importantly, the *Patterson* court never ruled on the issue of ERISA qualification. Throughout the entire history

of the case, the courts and parties assumed that the plan in issue there was ERISA qualified. The Court's holding was narrowly related to the fact that ERISA law falls within the definition of "applicable nonbankruptcy law" so as to exclude a plan which the parties admitted was ERISA qualified from the debtor's estate, pursuant to 11 U.S.C. § 541(c)(2).

In light of the foregoing authority, we conclude that the instant Plan is not subject to ERISA and therefore is not ERISA qualified. The only participants at the Plan's inception were the joint owners of its sponsor. Indeed, the common thread in the post-*Patterson* cases which held that a plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA, is that, in each case, the debtor (or the debtor and his spouse) were the only participants that the respective plans ever had. *See Hall, supra,* 151 B.R. at 412; *In re Lane,* 149 B.R. 760 (Bankr.E.D.N.Y.1993); *Witwer, supra,* 148 B.R. at 930; and *In re Pruner,* 140 B.R. 1 (Bankr.M.D.Fla.1992). Consistent with the reasoning of these cases, we hold that owners of plan sponsors do not come within the definition of employees of the sponsor, regardless of whether they are husband and wife. Since the instant Plan's sole participants were owners, we find that the Plan did not cover any employees, and it does not qualify under ERISA.

3. THE DEBTOR'S PLAN IS AT LEAST PRESENTLY EXEMPT UNDER 42 PA.C.S. § 8124(b)(1)(ix), SINCE IT HAS BEEN DETERMINED TO BE QUALIFIED UNDER THE IRC, AND WE ARE THEREFORE PREPARED TO UPHOLD THE DEBTOR'S CLAIMED EXEMPTION UNLESS AND UNTIL THIS DETERMINATION IS RESCINDED BY THE IRS

Despite the foregoing result, the Plan nevertheless may also be exempt under applicable nonbankruptcy law other than ERISA. Applicable nonbankruptcy law includes Pennsylvania state Law, such as that invoked by the Debtor under 11 U.S.C. § 522(b)(2)(A). The Plan is therefore exempt if it falls within the scope of the Pennsylvania exemption statute invoked by the Debtor, 42 Pa.C.S. § 8124(b)(1)(ix), which specifically provides for the exemption of certain retirement funds and accounts. It could also conceivably be exempt as a valid spendthrift trust under Pennsylvania law. However, since the Debtor has invoked only 42 Pa.C.S. § 8124(b)(1)(ix), the Debtor's claims under that statute will be our sole focus in our following discussion of the Exemption Issue hereinafter.

As originally enacted in 1976, 42 Pa.C.S. § 8124(b)(1)(i) through (vii) provided, as to pension plans, that only a debtor's interest in a pension plan set up by an employer for employees would be protected from creditors of the debtor. However, the statute was amended in 1978 to include 42 Pa.C.S. § 8124(b)(1)(viii), which additionally renders exempt retirement funds for self-employed persons. Thereafter, the statute was again amended, effective December 12, 1990, to include an additional provision, 42 Pa.C.S. § 8124(b)(1)(ix), quoted at page 689 n. 2 *supra,* which specifically renders any retirement or annuity fund "provided for" under the IRC exempt as well. This legislative history reflects an intention by the Pennsylvania legislature to continually broaden the scope of exemptions for Pennsylvania pension plan beneficiaries.

Options argues that, in order for the Pennsylvania exemption statute to be applicable to the instant Plan, the Plan must be a "tax qualified" plan provided for under the IRC. The Debtor's initial response is that, since the IRS has determined the Plan to be qualified for treatment under the IRC, this court is obliged, irrespective of what it believes regarding the tax qualification of the Plan, to defer to the IRS' 1986 favorable determination. The Debtor has sought to characterize this argument as an application of the doctrine of primary jurisdiction, as referenced by this court in *In re St. Mary Hospital,* 125 B.R. 422, 430–32 (Bankr.E.D.Pa.1991).

In *St. Mary Hospital,* this court was faced with deciding a challenge to a Medicaid reimbursement determination. We decided to temporarily (for 120 days) defer to an ongoing state administrative process. However,

here, there is no ongoing IRS process involving the Plan. Any deferral may have to extend far in excess of 120 days to be meaningful. Moreover, the IRS has not ruled on the tax qualification of the Plan in its present state, in the light of subsequent legislative amendments.

■ While the Debtor's contention that this court must grant deference to the IRS' determinations regarding the tax qualification of the Plan is reasonable, since the IRS and not this court must establish the tax status of the Plan not only while this case is pending, but as long as the Plan is in existence, the Debtor's invocation of the doctrine of primary jurisdiction is misplaced. In *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1162 (3rd Cir.1993), the court recently explained that the "doctrine of primary jurisdiction, despite what the term may imply, does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts."

The Debtor correctly asserts that the IRS possesses specialized knowledge and expertise which this court lacks in ruling upon the tax qualification of the Plan. However, lack of specialized expertise in tax matters does not preclude bankruptcy courts from adjudicating tax issues. *See* 11 U.S.C. § 505. The determination of the validity of the Debtor's claimed exemptions appears to clearly constitute a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(O). This court is therefore obliged to render a swift, independent determination regarding the Debtor's claimed exemption in the Plan proceeds.

The position of Options can be characterized as a request that this court determine that the IRS will retroactively disqualify the Plan from tax qualification. In arguing that such a disqualification would be appropriate, Options contends that the Plan has not been amended to comply with changes in the Tax Code effectuated by the Tax Reform Act of 1986 ("the TRA") and subsequent legislation. Options relies on the proposition that, if the Plan is not in operational compliance with the IRC at present, it does not qualify under the

IRC; it is not deterred by the unchanged positive determination of the tax qualification of the Plan was received by Debtor, since that occurred seven years ago. Thus, it contends that the Plan is not now a "tax qualified plan" and should not be exempt from distribution to creditors in the administration of the Debtor's estate.

In support of its proposition that this court should disqualify the Plan due to the fact that the Plan violated provisions of the IRC, Options cites *Lane, supra; Hall, supra;* and *In re Swift,* 124 B.R. 475 (Bankr.N.D.Tex. 1991), *aff'd,* 3 F.3d 929 (5th Cir.1993). In all three cases, the debtors sought to exempt pension plans from their respective bankruptcy estates. In all three cases, upon consideration of objections to the exemptions, the respective bankruptcy courts held that the plans lost their tax qualified statuses due to violations of the IRC or a failure to adhere to amendments to the IRC. Options requests that this court follow this line of cases.

In *Lane, supra,* 149 B.R. at 765, the bankruptcy court found the debtor's Keogh Plans to be "top heavy" because they failed to meet the minimum contribution requirement to employees, pursuant to § 416 of the IRC. Since the plans were thus "top heavy," the court held that they were not "qualified" pension plans pursuant to the IRC, and that the provisions of the individual Keogh plans were not exempt property.

In *Hall, supra,* 151 B.R. at 424, the bankruptcy court found that the Debtor's pension plan did not satisfy the "minimum participation rule," § 401(a)(26) of the IRC. This rule mandates that, in order for a trust to constitute a qualified trust, the trust must be part of a plan which, on the day of the plan year, benefits the lesser of (1) fifty (50) employees of the employer; or (2) forty (40%) percent or more of all employees of the employer. The evidence presented to the court in *Hall* showed that a maximum of only one third (33⅓%) of the employer's employees and former employees could have accrued meaningful benefits. Therefore, the court found that § 401(a)(26) of the IRC was not satisfied. Consequently, the court held that, as of January 1, 1989, the effective date of the minimum participation rule, the pen-

sion plan lost its tax qualified status and was not exempt.

In *Swift, supra,* 124 B.R. at 484, the trustee and other movants asserted that the debtor's individual retirement account ("IRA") did not comply with certain provisions of the IRC, as amended by the TRA, and that, consequently, the IRA did not qualify under applicable provisions of the IRC. The TRA provides a delayed date by which qualified plans must be amended to conform to changes in the qualification requirements. Plans that are terminated must be amended no later than the date of termination to comply with those provisions of TRA that have become effective with respect to the plan as of the date of the termination. The debtor, whose plan had terminated, presented no evidence that his plan comported with the IRC. The bankruptcy court, finding that the plan, when terminated, had not been amended to satisfy at least three tax qualification requirements, held that it was not tax qualified nor exempt.

With respect to the instant Plan, Options asserts that it violates § 415 of the IRC, which, under § 401(a)(16), disqualified the Plan. Section 401(a)(16) states that a plan is disqualified if it authorizes benefits or contributions which exceed the limitations of § 415. Section 415, in turn, places limits on the maximum rate at which a defined benefit plan may accrue benefits for participants. It will be recalled that Options' witness, Serota, testified that the distribution to Becker exceeded the maximum benefit allowed under § 415.

Additionally, Options asserts that Becker was never an employee of MKI and thus any distribution to him violated the exclusive benefit rule set forth in § 401(a)(2) of the IRC. This rule requires that the assets in a plan trust be held for the exclusive benefit of employees. Moreover, even if Becker were an eligible employee, Options contends that the Plan violated § 415(b), which disqualifies any defined benefit plan that provides a benefit in excess of the limitations of § 415(b).

In response to this testimony, it will be recalled, *see* pages 690–91 *supra,* that Fromm testified that, while he has not yet done so, he intended to amend the plan to satisfy all of the requirements of the TRA prior to the final deadline.

Our resolution of whether the Debtor's exemption of the Plan proceeds is permissible under state law begins by analysis of the specific language of the Pennsylvania exemption statute in issue, 42 Pa.C.S. § 8124(b)(1)(ix). That statute does not provide that a retirement fund, to be exempt, must arise from a "qualified" "plan." Neither the word "qualified" nor the word "plan" appear anywhere in the legislation. Rather, the statute provides for an exemption for a "fund provided for" under certain sections of the IRC.

It appears to us that, in drafting this statute, the Pennsylvania legislature intentionally avoided the use of the federal terms "qualified" and "plan." However, whatever it intended, those words do not appear in the statute. In this respect, 42 Pa.C.S. § 8124(b)(1)(ix) is broader than the statutes at issue in the authorities relied upon by Options.

For instance, in this respect, § 8124(b)(1)(ix) can be contrasted to the New York exemption statute interpreted in *Lane, supra,* 149 B.R. at 767. Pursuant to the New York statute in issue, N.Y. DEBT & CREDIT LAW § 282, the comparable exemption is specifically limited to a "Keogh, retirement or other 'plan' ... which is 'qualified' under § 401 of the United States Internal Revenue Code...." Similarly, the Texas statute construed in *Swift* provides that an exemption is created for retirement benefits " 'unless the ... account does not qualify under the applicable provisions of the Internal Revenue Code of 1986.' " 124 B.R. at 485, quoting TEX.PROP.CODE, § 42.0021(a).[4]

The Debtor argues that enactment of § 8124(b)(1)(ix) "grew out" of Senate Bill 1535, which was introduced at the request of the Pennsylvania Institute of Certified Public Accountants in January, 1990, to attempt to

---

4. No state exemption statute was at issue in the third case cited by Options, *Hall, supra.* The only issues presented in *Hall* were whether the pension plan in issue qualified as exempt under ERISA or under 11 U.S.C. § 522(d)(10)(E).

broaden the exemption of pension plans in bankruptcy proceedings. The Debtor attached to his pre-hearing Brief a paper prepared for the Pennsylvania Senate Judiciary Committee by its counsel which indicates that the broad language of § 8124(b)(1)(ix) was intended to alter a current judicial trend holding that ERISA superseded state exemption laws as to pension plans. *E.g., In re Dyke*, 943 F.2d 1435, 1446 (5th Cir.1991); and *In re Hirsch*, 98 B.R. 1 (Bankr.D.Ariz. 1988), *aff'd sub nom. In re Siegel*, 105 B.R. 556 (D.Ariz.1989).

We do not place much weight upon the statements in this paper, as they are something short of legislature history. We simply observe that the language of § 8124(b)(1)(ix) is very broad, and that it appears to have been drafted to include even plans which are not technically "tax qualified" within its scope.

In one sense, the Pennsylvania statute's failure to insist upon tax qualification is not practically very meaningful. If a plan is not qualified under the IRC by the IRS, it may not be good for very much. Although we have concluded that the doctrine of primary jurisdiction does not prevent us from ruling on Options' Objections and that the bankruptcy exemption issue is one for this court alone to make forthwith as a core proceeding, there are practical limitations on the effect of such an order. We have not been asked to, and therefore did not, purport to make any sort of determination regarding the IRC qualification of the Debtor's Plan under 11 U.S.C. § 505. If the IRS should rule, in the future, that the Plan is not tax qualified under the IRC, it would appear that the Plan would be of limited use to the Debtor. Furthermore, were the Plan disqualified under the IRC, it would appear inequitable for us to preclude Options from ever reaching the funds contained in it. For this reason, we condition the future effect of our ruling that the Plan is exempt on the Plan's continuing qualification, at least until we enter a Final Decree in this case, which, per Local Bankruptcy Rule 5009.1, normally terminates 180 days after confirmation of the Debtor's bankruptcy plan. In that way, our ruling would not unfairly prejudice Options' rights if the IRS makes a ruling while this case remains within the normal scope of this court's jurisdiction.

On the other hand, it would not seem appropriate for us to rule that the Plan is not tax qualified, and then have the IRS rule that, for its purposes, the Plan *does* meet the requirements of the IRC.

■ Although the effect of our ruling may therefore be more limited than it might initially seem, we nevertheless feel obliged to make a ruling. The issue of the Debtor's right to claim exemptions under the Bankruptcy Code must be resolved by this court to allow this case to be administered. In light of this decision, the Debtor should have no difficulty completing the preparation of his Plan and Disclosure Statement by October 29, 1993. We hold that, as matters now stand, the Plan is exempt.

We are persuaded by the fact that, although the Plan has not yet been amended to comply with the TRA, the time period for making necessary amendments has not run. In the mean time, the IRS' positive determination letter in reference to the Plan still stands. The IRS has never intervened; it has never imposed any penalties or fines against the Plan sponsor for making excessive distributions or any other improper action, nor has it disallowed any tax benefit to the Debtor or to Becker on account of the operations of the Plan. It seems senseless for this court to disqualify the Plan at this point, since the IRS has in the past and may well subsequently find it qualified. If the IRS intervenes at a later date and disqualifies the Plan, then and only then would it appear to us appropriate to preclude the Debtor from continuing to assert that its proceeds are exempt from claims of the Debtor's creditors.

We have already noted that we find a distinction between the Pennsylvania law at issue and the laws at issue in *Lane, Swift,* and *Hall, supra.* We should also note that we find a significant distinction between the IRC deficiency alleged to exist in the Plan in issue by Options, and the deficiencies present in the cases cited by Options, *e.g., Lane, Hall,* and *Swift, supra.* The deficiencies identified by the respective courts in *Lane*

and *Hall* appeared to be incurable. The *Swift* plan had already been terminated as of the date of the court's decision.

In the instant case, the main deficiencies alleged are curable, according to Fromm, whom we found both competent and credible. Moreover, they relate mostly to the fact that Becker, as opposed to the Debtor, received excessive benefits from the Plan. It appears inequitable to punish the Debtor with disqualification of exemption of his own benefits because the Plan was too generous to Becker, who apparently no longer has any relationship with MKI or the Debtor, and with whom the Debtor was prepared to settle final accounts in an adversarial setting by payment of what must have seemed a small sum to the Debtor at the time.

■ Finally, our decision is influenced by the recognition that the issues are technical and close ones and that, when there is a significant doubt about the outcome of such a matter, " 'liberal interpretation of exemption laws are favored.' " *In re Sidebotham*, 77 B.R. 504, 506 (Bankr.E.D.Pa.1987), quoting *In re Wilson*, 22 B.R. 146 (Bankr.D.Or.1982).

With the caveats noted, we are prepared to overrule Options' Objections to the Debtor's attempt to exempt his MKI pension Plan.[5]

## 4. THE DEBTOR IS NOT ENTITLED TO EXEMPT HIS NEW JERSEY CONDOMINIUMS BY APPLYING THERETO THE EXEMPTION LAW OF PENNSYLVANIA

In addition to its Objections to the Debtor's claim of an exemption in the funds in his pension Plan, Option has preserved its Objections to the Debtor's claim that his New Jersey condominiums are exempt under the law of Pennsylvania. We have already ruled, at page 689 *supra*, that there is no evidence to support any of the other Objections asserted by Options.

■ As to the remaining issue of the exemption of the condominiums, we find, contrary to the assertions of the Debtor, that the state law applicable to a claim of exemptions in a debtor's real estate is the law of the state in which the real property is located. *See In re Lewis*, 64 B.R. 415, 416–17 (Bankr.E.D.Pa.1986), *aff'd*, 85 B.R. 719 (E.D.Pa.1988), *rev'd on other grounds*, 875 F.2d 53 (3rd Cir.1989). Otherwise, the exemptions in realty to which a debtor would be entitled would depend on the choice of venue of a bankruptcy case, thus encouraging forum-shopping. Therefore, although Pennsylvania law applies to the Debtor's personal residence, which is located in Pennsylvania, the Debtor's right to exemptions in the two condominiums, which are located in New Jersey, are subject to the application of New Jersey law.

The applicable New Jersey law pertaining to tenancies by the entireties and the trustee's right to sell such property is reviewed in *In re Youmans*, 117 B.R. 113 (Bankr.D.N.J. 1989). The *Youmans* court concluded that 11 U.S.C. § 363(h) gave a bankruptcy trustee the power to sell New Jersey real property held as entireties property, allowing the estate to retain half of the sale proceeds. *Id.* at 118. Here, § 363(h) is not really in issue because the question here is not whether the condominiums can be sold, but whether they are exempt. The fate of this property will presumably be determined under the Debtor's impending plan of reorganization.

The Debtor's only opposition to this objection is premised, without authority for doing so, on the applicability of Pennsylvania law, which precludes the sale of entireties' property to satisfy the debts of only one spouse. Our conclusion that New Jersey law applies totally undermines this defense. The claim that the condominiums are exempt will therefore be disallowed.

## D. THE DISCHARGEABILITY ISSUE

### 1. PERTINENT FACTS

The Dischargeability Issue arises out of a contractual relationship between Options and

---

5. Options also argued, at least in its pre-hearing submissions, that the amount exemptible by the Debtor was limited by the terms of 42 Pa.C.S. § 8124(b)(1)(ix)(B). *See* page 689 n. 2 *supra*. However, this statutory provision appears to limit the exemption relative to only direct contributions to a plan by the debtor. There is no evidence that the Debtor made any direct contributions to the instant Plan. Rather, it appears that all of the contributions were made by MKA and MKI.

MKI, designated as a Market Maker's Agreement ("the Market Agreement"). Pursuant to the terms of the Market Agreement, signed by the Debtor in his corporate capacity on June 1, 1987, MKI agreed that "[a]ll securities and other property of the undersigned which you may be carrying for the undersigned, or which may at any time be in your possession or under your control, shall be subject to a general lien and security interest in your favor for the discharge of all the undersigned's indebtedness and other obligations to you."

On October 19, 1987, the stock market crash occurred, which caused a credit amount of approximately $10,500,000 in the Debtor's account with Options to be reduced to a deficit of $2,000,000. According to the terms of the Market Agreement, Options began liquidating the remaining assets of the Defendant.

On or about November 4, 1987, Options and the Debtor began negotiating a Work Out Agreement ("the Work Out"). However, during the early stages of these negotiations, the Debtor withdrew a total of $388,300 from MKI's corporate accounts without informing Options. During the Work Out negotiations, but prior to both parties' consent to the final terms of the Work Out on March 24, 1988, the Debtor withdrew another $233,000, a total sum of $611,300 from MKI's corporate accounts. All of these withdrawals were without Options' knowledge of the withdrawals or even of the existence of the corporate accounts in which those monies were located.

Pursuant to the terms of the Work Out, the Debtor agreed to transfer five seats on the PSX held by MKI and a related entity to Options and to make certain payments, including an assignment of his anticipated joint marital tax refunds, to Options. Options, on its part, agreed to allow MKI unfettered access to a trading account of $900,000 in order to attempt to revive what had been a mutually profitable relationship.

The Work Out contained a restatement of indebtedness of MKI and related entities in the aggregate amount of $5,176,953.00. In light of the foregoing, the Work Out provided a full release of liability to it by, *inter alia,* the Debtor, excepting only that he was not released "from complete performance of the terms of this Agreement and other documents contained therein and applicable to them."

Unfortunately, subsequent to the parties' mutual acceptance and implementation of the Work Out, MKI failed to make its anticipated comeback in the stock market. As a result, MKI again defaulted on its debt to Options, and, in response, Options, in June, 1989, instituted an arbitration proceeding with the PSX against, *inter alia,* the Debtor individually. On June 5, 1993, the PSX entered a Decision ("the Decision"), wherein Options was awarded a judgment in excess of $5.6 million against MKI and the Debtor, and a judgment in the amount of $346,342 against the Debtor and his wife Carol.

The Debtor, his wife, and MKI filed a petition in federal district court seeking to vacate the PSX Decision. In a Memorandum ("the Memorandum") dated September 25, 1992, the Honorable Jay C. Waldman of the district court denied the petition in its entirety. The petitioners, including the Debtor, have appealed this decision to the Third Circuit Court of Appeals.

One of the principal issues carrying over from this series of proceedings is the efficacy of the release contained in the Work Out. According to Options, the Debtor vigorously but unsuccessfully asserted the validity of the release as a line of defense before the PSX. This issue was again raised before Judge Waldman. In the course of the 30–page Memorandum, one paragraph, at page 27, is directed to this issue, which reads as follows:

> Petitioners contend that in any event First Options had unconditionally released Manuel Kaplan from any liability for the debt in the Work–Out. Even if this were so, it would not release MKI from liability for the debt and, on the record adduced, would not preclude a piercing of the corporate veil. More importantly, there was not an unconditional release of Manuel Kaplan. The release provision in the Letter Agreement ... is expressly contingent upon his "complete performance of the terms of this

Agreement and other documents contained herein and applicable to them."

Options's initial Complaint in this Proceeding, in addition to focusing on the Debtor's alleged deception in transferring the $611,300 into his own accounts, also focused on certain other alleged misrepresentations by the Debtor, through a series of "sham" transactions, that $500,000 of the $900,000 placed in the trading account had been contributed from loans rather than (as was actually the case) from the Debtor's personal funds.

The Complaint contained two Counts. In Count I, Options sought to have $611,300 of the Debtor's liability to it declared nondischargeable under 11 U.S.C. § 523(a)(4), on the ground that the Debtor breached his fiduciary duty, as the officer of an insolvent corporation, to preserve MKI's assets for Options' benefit as MKI's creditor. In Count II, Options sought to have $2.6 million of its debt declared nondischargeable under 11 U.S.C. § 523(a)(6), on the ground that it would have been able to pursue the Debtor for at least this sum had the Debtor not fraudulently lulled it into agreeing to the Work Out.

In the Memo of September 13, 1993, in which we denied the Debtor's Motion to Dismiss the Complaint, we noted, initially, slip op. at *1, that Options had alleged two rather serious intentional and wrongful acts on the Debtor's part: (1) his fraudulently conveying $611,300 to himself from MKI's funds when he knew that MKI was hopelessly insolvent; and (2) his falsifying the source of certain payments made to Options in the Work Out. While we found certain flaws in the Plaintiff's legal theories, as pleaded, we suggested that, if these acts were proven and proven to be intentional and wrongful, these facts "could quite conceivably support a claim under 11 U.S.C. §§ 523(a)(2)(A) or 523(a)(6)." *Id.*, slip op. at *4. However, we questioned the viability of Options' § 523(a)(4) claims, because the presence of the requisite express trust seemed doubtful, and we doubted whether any causal connection between the Debtor's allegedly wrongful actions and the damages alleged in, particularly, Count II of the Complaint had been established.

The Amended Complaint, filed on September 17, 1993, in response to the Memo, focused solely upon the Debtor's retention of the $611,300 described at page 699 *supra*, from MKI in late 1987. The Complaint recited three Counts, under §§ 523(a)(4), (a)(6), and (a)(2)(A), all seeking to have only the $611,300 portion of the Debtors' indebtedness to Options declared nondischargeable.

The Debtor, in filing his Answer to the Amended Complaint on what was the eve of trial, raised the issue of the efficacy of the release contained in the Work Out as an affirmative defense for the first time. Options has countered this defense by claiming that the potency of the release was collaterally estopped by the Decision of the PSX arbitrators and the Memorandum of Judge Waldman.

At the outset of the trial, the Debtor was called as of cross-examination by Options. He was also called to testify again, on direct, at the end of the trial by his own counsel. Options also called as witnesses Gregory J. Kaiser, the operations manager of its Philadelphia office, who was a party to the Work Out negotiations; and Kevin McCarthy, an accountant who ultimately analyzed the movement of monies through all of the Debtor's and MKI's accounts during the relevant 1987 and 1988 time-period. The Debtor also called Michael Waber, a trader on the PSX who believed that, in the chaos which engulfed the PSX on and immediately after Black Monday, Options took advantage of the Debtor rather than vice versa.

Kaiser testified that the Debtor did not inform Options of the withdrawal of the $611,300 from the MKI accounts and that it was necessary to have had this information on the table for the parties to have negotiated the Work Out in good faith. However, Kaiser did not identify any direct inquiries by Options of the Debtor concerning such withdrawals, nor were any explicit misleading statements or conduct by the Debtor in this regard noted.

McCarthy testified that, at all times after October 19, 1987, MKI was insolvent. He also noted that the Debtor had not concealed the presence of some of MKI's smaller accounts, but he opined that this apparent can-

dor may have been a cover to conceal transfers from the larger accounts containing the $611,300.

The Debtor was asked what he did with the $611,300 on three occasions—by the court, in the course of his initial testimony when called by Options; by Options' counsel shortly thereafter when his answer to the court's inquiry appeared inconclusive; and by his own counsel on direct near the end of the trial. His first responses were that he merely moved the funds from one account to another, which was not very enlightening regarding their ultimate use. In his final testimony, the Debtor suggested, without providing specifics or documentary support therefor, that he used the money to pay certain bills of MKI. At one point, he became very apologetic, as if admitting that he now recognized that these actions were wrong. However, he consistently insisted that, at the time he had made the withdrawals from MKI's accounts innocently and had done nothing to deceive Options.

Little in the way of testimony was presented about the release. Options indicated that it had refrained from calling witnesses on that issue because of what it believed was conclusive collateral estoppel or *res judicata* in its favor on that issue. Ultimately, Options requested the opportunity to brief this issue post-trial, and the Briefs submitted on October 1, 1993, on the Dischargeability Issue by both parties do give prominence to this issue.

We find that, even putting aside the release issue, Options is not entitled to prevail on the Dischargeability Issue under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), or (a)(6), which provide as follows:

§ 523. **Exceptions to Discharge.**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension or renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . .

We will therefore discuss these issues first.

However, we also believe that the Debtor is entitled to prevail because the release eliminated the only obligations of the Debtor to Options which could have conceivably fallen within §§ 523(a)(2)(A), (a)(4), or (a)(6).

2. OPTIONS WAS UNABLE TO PROVE THAT THE DEBTOR ACTED WITH THE REQUISITE FRAUDULENT OR MALICIOUS INTENT NECESSARY TO SUSTAIN CLAIMS UNDER §§ 523(a)(2)(A) OR 523(a)(6)

In the Memo, slip op. at *4, this court suggested that, if Options were able to establish that the Debtor caused MKI to make a fraudulent conveyance to himself, the proceeds of this conveyance could be non-dischargeable under § 523(a)(2)(A). We did not mean, in making this statement, to suggest that we found that the Debtor had actually been the recipient of a fraudulent conveyance. Proof of same at trial was necessary. Nor did we mean to suggest that Options' proof of a constructive fraudulent conveyance, as opposed to an actual fraudulent conveyance, would suffice to establish nondischargeability under § 523(a)(2)(A).

█ As this court has frequently articulated, the requirements to prove a cause of action under § 523(a)(2)(A) are demanding:

In order for the Plaintiff to prevail in [a] claim based upon § 523(a)(2)(A), the Plaintiff [is] obliged to prove, by a preponderance of the evidence,

(1) that the debtor made the [mis]representation[s];

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor [relied] on such representations;

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made;

*In re Feldman,* 111 B.R. 481, 48 (Bankr. E.D.Pa.1990), citing *In re Cirineo,* 110 B.R. 754, 757, 758 (Bankr.E.D.Pa.1990); *In re Bergman,* 103 B.R. 660, 671 (Bankr. E.D.Pa.1989); and *In re Stelweck,* 86 B.R. 833, 846 (Bankr.E.D.Pa.1988), *aff'd sub nom. United States v. Stelweck,* 108 B.R. 488, 489 (E.D.Pa.1989).

*In re Henderson,* 134 B.R. 147, 162 (Bankr. E.D.Pa.1991).

Options asserts, with good reason, that it has proven, per McCarthy's testimony, that MKI was insolvent at the time of the transfers to the Debtor. It also alleged, that the transfers totalling $611,300 from MKI to the Debtor in late 1987 were made without adequate consideration to MKI.

■ However, the uncontroverted testimony of the Debtor is that he used the funds removed from MKI's accounts to make salary payments and to maintain MKI's relationship with smaller creditors by making certain payments thereto. The Debtor thus testified that all of the funds removed by him from MKI's accounts were utilized by him for MKI's benefit. The proof of inadequate consideration to MKI was therefore lacking. Consequently, Options has not proven that these transfers constituted even constructive fraudulent conveyances under applicable Pennsylvania law, let alone actual fraudulent conveyances. *See Garden State Standardbred Sales Co. v. Seese,* 417 Pa.Super. 15, 21–22, 611 A.2d 1239, 1243 (1992); *Speiser v. Schmidt,* 387 Pa.Super. 30, 37–38, 563 A.2d 927, 931, *appeal denied,* 525 Pa. 647, 581 A.2d 573 (1989); and *Stinner v. Stinner,* 300 Pa.Super. 351, 354, 446 A.2d 651, 652 (1982). Moreover, assuming *arguendo* that constructive fraudulent conveyances under Pennsylvania law were proven, without more, Op-

tions' proof would not have been sufficient to satisfy the requirements for nondischargeability under § 523(a)(2)(A). Proof of actual fraud was a prerequisite.

Furthermore, it is apparent that the Debtor believed that, by keeping MKI in business and reducing its obligations to third parties, he was benefitting Options as well as himself in maintaining an enterprise which, at that point, both parties wanted to survive until the Work Out could be completed. Therefore, Options has not established, on this record, that the Debtor had the intention and purpose of deceiving Options when he made these payments.

The evidence presented by Options on the § 523(a)(2)(A) issue, per Kaiser, establishes no more than the fact that Options assumed that the Debtor would accept a responsibility to disclose to it any significantly large transfers of funds by MKI to the Debtor during the Work Out negotiations. There is no evidence that the Debtor actually accepted or acknowledged any such responsibility. Nor is it entirely clear to us that the Debtor should have intuitively assumed that he had such responsibilities. As Waber testified, the stock market crash created a general chaotic state of affairs which blurred the normal responsibilities between the parties involved in active trading on the PSX. Under these circumstances, for these reasons also, we are unwilling to brand the Debtor's actions as knowingly false and done with the intent and purpose of deceiving Options. Indeed, if the Debtor's testimony is accepted, and there is no evidence to rebut it, even from McCarthy, who has obviously studied these events carefully, the Debtor merely acted in furtherance of a reasonable effort to keep MKI afloat until the Work Out Agreement could be implemented.

While we are somewhat uncomfortable with the Debtor's rather vague statements regarding the use of the large sum of funds which he withdrew from MKI over this period, his testimony was that those funds were not taken from MKI, but rather were used for MKI's benefit. There was no proof whatsoever that the withdrawn monies were used for the Debtor's personal benefit, unrelated to MKI or its business.

The Debtor attempted to present himself as a former plumber who lacked the high degree of sophistication of a PSX wheeler-dealer. While we find that this portrayal is somewhat exaggerated, given the Debtor's high level of financial success as a trader, we find his testimony, on the whole, to be credible. We do not therefore, ascribe a badge of fraud to the Debtor's withdrawals from MKI, since the Debtor was indeed acting in what he believed was the best interest of MKI, and that his so doing was reasonably probable to be successful and even beneficial to Options. Options has not proven to the contrary.

Therefore, we conclude that the second and third elements of the five-pronged prerequisites for establishing a cause under § 523(a)(2)(A) have clearly not been proven by the requisite preponderance of the evidence by Options. We also find it doubtful that the first, fourth, or fifth elements have been proven by the applicable standard of proof. Hence, Options claims under § 523(a)(2)(A) must fail.

■ As to Options' § 523(a)(6) claims, this court has summarized its views as to the difficult burdens which a plaintiff must meet to sustain a claim under this Code section thusly in the Memo, slip op. at *2, quoting at length from *In re Nichols*, 1991 WL 202256, slip. at *3–*4 (Bankr.E.D.Pa.1991):

There is a split of authority, nationally and locally, as to whether the plaintiff in a § 523(a)(6) must prove a specific intention on the part of the debtor to cause an injury to the plaintiff, or need prove only that the debtor's intentional actions, without just cause or excuse, resulted in damages to the plaintiff. *See* Comment, *The Exceptions to Discharge for Willful and Malicious Injury: The Proper Standard for Malice*, 7 BANKR.DEV.L.J. 245 (1990) (cited hereafter as "Comment"). *Compare United States v. Stelweck*, 108 B.R. 488, 496 (E.D.Pa.1989), *aff'g*, 86 B.R. 833, 853 (Bankr.E.D.Pa.1988); *In re Gaebler*, 83 B.R. 264, 267 (Bankr.E.D.Pa.) ("*Gaebler I*"), *rev'd*, 88 B.R. 62 (E.D.Pa.1988) ("*Gaebler II*"); and *In re Lane*, 76 B.R. 1016, 1023 (Bankr.E.D.Pa.1987) (intent to cause injury to plaintiff required) *with Gaebler*

*II, supra*, 88 B.R. at 64–65; and *In re Horldt*, 86 B.R. 823, 827–28 (Bankr. E.D.Pa.1988) (specific intent to cause injury to plaintiff not required).

However, it is clear that the holding of *Tinker v. Colwell*, 193 U.S. 473, 489–90, 24 S.Ct. 505, 501–10, 48 L.Ed. 754 (1904), that reckless conduct of the debtor,. and, by implication, any conduct rising to a lesser degree of culpable negligence, could suffice to meet the requirements of the earlier counterpart of § 523(a)(6) was expressly overruled by Congress in its enactment of § 523(a)(6). S.REP. NO. 989, 95th Cong., 2d Sess. 77–79 (1978); and H.R.REP. NO. 595, 95th Cong., 1st Sess. 363–65 (1977). *See also, e.g., In re Quezada*, 718 F.2d 121, 122–23 (5th Cir.1983), *cert. denied*, 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984); *Horldt, supra*, 86 B.R. at 826–27; 3 COLLIER ON BANKRUPTCY, ¶ 523.-216, at 523–131 and 523–132 (15th ed. 1990); and Comment, *supra*, 7 BANKR. DEV.L.J. at 245. It is therefore required that the plaintiff in a successful § 523(a)(6) action establish that the debtor has committed an unjustified, wrongful act, with at least scienter that the result of the act was necessarily to produce harm. *See In re Littleton*, 942 F.2d 551, 21 B.C.D. 1619, 1621 (9th Cir.1991); *In re Posta*, 866 F.2d 364, 367–68 (10th Cir.1989); and *In re Long*, 774 F.2d 875, 880–81 (8th Cir.1985).

Therefore, the Plaintiff is obliged to show that a specific act was committed by the Debtor from which it could at least be inferred that the harm was intentionally caused.

In our discussion of Options' claims under § 523(a)(2)(A), we found that Options clearly had not proven that the Debtor committed any knowingly wrongful actions vis-a-vis Options, nor that he acted with the intention or purpose of deceiving or injuring Options. These conclusions preclude our finding any intentional or even reckless actions of the Debtor which were intended to, or could have been reasonably foreseen to cause harm to, any party, let alone Options in particular.

Therefore, we conclude that there is no basis to find that Options' claim to have this

debt declared nondischargeable under § 523(a)(6) may prevail.

3. OPTIONS' FAILURE TO ESTABLISH THAT THE DEBTOR'S ALLEGED DEFALCATION BREACHED AN EXPRESS TRUST OBLIGATION OF THE DEBTOR TO OPTIONS' BENEFIT PRECLUDES OPTIONS' ATTEMPT TO HAVE THIS DEBT DECLARED NONDISCHARGEABLE UNDER 11 U.S.C. § 523(a)(4)

In order for this court to determine that any portion of the Debtor's obligation to Options must be deemed nondischargeable pursuant to the "fraud or defalcation" prong of 11 U.S.C. § 523(a)(4), Options was obligated to prove that the Debtor was acting in a fiduciary capacity and committed defalcation while in that capacity.

■ It is breath of the term "fiduciary capacity" which renders cases brought under § 523(a)(4) difficult to resolve. We have held that, to give rise to § 523(a)(4) liability, it is not sufficient for the plaintiff to prove only that there was a fiduciary relationship between the parties, but also to prove that there is an express trust held by the fiduciary (debtor) on behalf of the beneficiary (creditor), which did not arise out of the action that created the fiduciary relationship. *See In re Spector,* 133 B.R. 733, 739–40 (Bankr. E.D.Pa.1991) (holding that the "fraud or defalcation" prong of § 523(a)(4) requires the showing of an express trust); *In re Shervin,* 112 B.R. 724, 730–31 (Bankr.E.D.Pa.1990); and *In re Snyder,* 101 B.R. 822, 835 (Bankr. D.Mass.1989), *aff'd in part & rev'd in part on other grounds sub nom. Snyder v. Bornstein,* 923 F.2d 840 (1st Cir.1990).

■ There is authority for the principle that a corporate director who is deemed a liquidating trustee of a dissolved corporation is a § 523(a)(4) fiduciary of that corporation's creditors. *See In re Bagel,* 1992 WL 477052, slip op. at *12–*20 (Bankr.E.D.Pa.1992), *aff'd,* C.A. No. 93–289 (E.D.Pa. July 21, 1993), *appeal docketed,* No. 93–1797 (3rd Cir.). Generally, courts look to state law to determine whether there is a sufficient "trust relationship" to create a fiduciary relationship for purposes of § 523(a)(4). *See In re Specialty Plastics, Inc.,* 113 B.R. 915, 923 (Bankr.W.D.Pa.1990), *rev'd on other grounds sub nom. Committee of Unsecured Creditors v. Doemling,* 127 B.R. 945 (E.D.Pa.1991); and *In re Thorsen & Co.,* 98 B.R. 527, 529 (Bankr.D.Colo.1989). *Cf. In re Menendez,* 107 B.R. 789, 792 (Bankr.S.D.Fla.1989) (where a state statute expressly imposes a fiduciary duty on a liquidating trustee, the corporate officer was found to be a § 523(a)(4) fiduciary). However, this court has held that § 523(a)(4) requires more than just a fiduciary relationship; an express trust relationship between the debtor and the creditor must also be established. *See Spector, supra,* 133 B.R. at 739 (Bankr.E.D.Pa. 1991) (holding that a managing partner of a partnership is not a § 523(a)(4) fiduciary as to his co-partners).

■ This result does not conflict with Options' case authority, *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 209, 217 n. 25 (3rd Cir.1990); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973); *Bagel, supra;* and *Stull v. Bellefonte Stone Products Corp.,* 205 Pa.Super. 40, 43, 205 A.2d 677, 680 (1964). The foregoing cases speak of a fiduciary relationship between an officer of a corporation and the corporation's creditors. However, they are not § 523(a)(4) cases, and they do not hold that there was any sort of preexisting express trust relationship between the corporate officer and the corporate creditors. *But cf. Specialty Plastics, supra,* 113 B.R. at 923 (corporate director is found to be a § 523(a)(4) fiduciary vis-a-vis the corporation). We believe that the presence of an express trust relationship, either by agreement or as created by operation of law, is necessary to give rise to § 523(a)(4) liability.

As to the principle that an express trust relationship might be created upon the dissolution of a corporation, giving rise to a fiduciary relationship between a corporation director and a corporate creditor, we find the decision in *Heaney v. Riddle,* 343 Pa. 453, 456, 23 A.2d 456, 458 (1942), and similar cases, to be instructional in explaining the

distinction which we find significant. In *Heaney*, the court held that the assets of a corporation constitute a "trust fund" for the creditors, but only when the corporation has been "dissolved." *Id.* This is not the case here. The Debtor's corporation, MKI, not only was not in the process of liquidation at the critical time when the Debtor received the $611,300 in issue from it, but also the Debtor and Options were engaged in negotiating a Work Out which would perpetuate its existence as an operating corporation.

Assuming that the director of a corporation in liquidation may be a liquidating trustee for purposes of § 523(a)(4), the difficulty with finding that the relationship of the director of a corporation to its creditors automatically gives rise to an express trust of all assets held by that corporation for purposes of § 523(a)(4) broadens the scope of that provision to embrace a debtor/creditor relationship. Such an extension of § 523(a)(4) is, in our view, a stretch of § 523(a)(4) beyond the purposes for which it was intended. Moreover, as we indicated in our quotation in the Memo, slip op. at *1, from our decision in a companion case to *Bagel, In re Cocivera; U.S. v. Cocivera*, Bankr. No. 92–12042S, Adversary No. 92–0739S, 1992 WL 560937, we question the result in *Bagel*, noting that the indebtednesses to the creditors may be found not to predate the purported fiduciary relationship in this situation. Therefore, the trust relationship which arises from a corporate liquidation appears likened to a trust *ex maleficio*, which arises out of the very action which creates the alleged fiduciary relationship. Such a relationship does not give rise to § 523(a)(4) liability.

It has long been the law that a creditor must prove more than just the presence of a fiduciary relationship before grounds to deny a debtor a discharge on the ground of defalcation is present. In addition, the creditor must also prove that an express trust has been created on behalf of the beneficiary in the relationship. *See Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236 (1844) (for bankruptcy purposes, "fiduciary capacity" "speaks of technical trusts, and not those which the law implies from contract"). This court therefore resists any efforts to broaden the traditional limitation of § 523(a)(4) to arise in situations where anything less than the presence of an express trust relationship is established.

The prerequisites for the creation of an express trust relationship under Pennsylvania law are, as we thusly held in *In re Kulzer Roofing, Inc.*, 139 B.R. 132, 139–40 (Bankr.E.D.Pa.), *aff'd*, 150 B.R. 134 (E.D.Pa. 1992), quite demanding:

> The elements of an express trust, as developed by Pennsylvania case law, are (1) an express intent to create a trust: (2) an ascertainable *res;* (3) a sufficiently certain beneficiary; and (4) a trustee who "owns" and administers the *res* for the benefit of another (the beneficiary). *See In re Penn Central Transportation Co.*, 486 F.2d 519, 524 (3d Cir.1973), *cert. denied sub nom. Baker v. Indiana H.B. R.R.*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) ("*Penn Central I* "); *Sherwin* [*v. Oil City Nat'l Bank,*] . . . 229 F.2d [835,] at 838, 839 [ (3rd Cir.1956) ]; *In re I.D. Craig Service Corp.*, 125 B.R. 453, 456 (Bankr.W.D.Pa. 1991); *In re CS Associates*, 121 B.R. 942, 959 (Bankr.E.D.Pa.1990); *In re Shervin*, 112 B.R. 724, 734 (Bankr.E.D.Pa.1990); and *Presbytery of Beaver–Butler United Presbyterian Church v. Middlesex Presbyterian Church*, 507 Pa. 255, 268–69, 489 A.2d 1317, 1324, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). . . . the absence of *any* of the express trust elements to be present is fatal to the contention that a trust exists, . . .

*See also, e.g., Thompson's Will*, 416 Pa. 249, 254–55, 206 A.2d 21, 25 (1965).

To demonstrate the requisite intention to create a trust, it is required that there be a showing that the "person receiving the money . . . under[stands] he is to keep the money for the other person and to return it to him when he has performed his obligations." *Buchanan v. Century Federal Savings & Loan Ass'n*, 306 Pa.Super. 253, 259, 452 A.2d 540, 543 (1982). If, on the other hand, it is understood that he may use the money as his own and repay it to the other when due, he is a debtor. *Id.*

■ The evidence presented in the instant Proceeding established that, pursuant to the terms of the Market Agreement between the parties which operated prior to the crash, the Debtor was normally to pay MKI's obligations to Options when they became due. Therefore, prior to the crash, the relationship between the Debtor/MKI and Options was definitely one of debtor and creditor. Subsequent to the crash, MKI still had the option of paying the Plaintiff, but the exercise of that option was subject to Options' exercise of its right to take MKI's assets to satisfy its debts without MKI's consent. Therefore, subsequent to the crash, while Options' status might have changed from that of an unsecured creditor to that of a secured creditor, it did not thereupon become the Debtor's or MKI's trust beneficiary.

The evidence proved that, on the day of the crash and immediately subsequent thereto, both parties scrambled as fast as they could to claim and possess whatever money was available. That behavior is further evidence that the parties did not believe, nor did they intend, that MKI or the Debtor was holding money in trust for the benefit of Options, nor that the Debtor would be violating a trust if he used MKI's cash to pay MKI's salaries or its other expenses of doing business.

The Market Agreement provides that the parties intended that Options would have a security interest in monies under the control of MKI. Consistent with the RESTATEMENT (SECOND) OF TRUSTS, § 12, cmt. i, at 39 (1959), quoted by *Buchanan, supra,* 306 Pa.Super. at 259, 452 A.2d at 543, " 'where a person deposits money with another as security for the faithful performance of obligations which he owes to the other, it depends upon the manifestation of intention of the parties whether the person receiving the money is a trustee with a security interest on the money or is a debtor.' "

Under the Market Agreement, the Debtor/MKI granted Options a security interest in money of which the Debtor maintained control in MKI's corporate accounts and which the Debtor could spend on his own behalf. MKI's insolvency, resulting from the crash of October, 1987, gave rise to Options' right to execute on its security interest in the funds in MKI's account. However, Options' obtaining an ability to execute on a security interest did not change the debtor/creditor relationship between the parties to that of trustee/beneficiary of a trust.

The Market Agreement provides that Options may withdraw whatever sums of money are due to it from any accounts over which MKI had control and which Options determined was necessary to protect its asset position. MKI apparently had numerous accounts of which Options was unaware of the time of the withdrawals. This is proven by the fact that the Debtor was able to withdraw the $611,300 from various account of MKI, and Options had no knowledge that this had been done until some time later. These circumstances support the conclusion that there was no ascertainable *res* available which could give rise to an express trust relationship. Since Options could not, at the time of the withdrawals, discern the precise accounts from which the Debtor withdrew the $611,300 in issue, it is clear that no identifiable *res* existed as to which express trust relationship could be found to attach existed.

We therefore conclude that, while we could perhaps find that there was a fiduciary relationship between the parties, we cannot find a manifestation of intent between the parties that the money which the Debtor removed from MKI's accounts was to be held in those accounts "in trust" for Options. This result is dictated by at least the first two, and possibly all four, of the several criteria which pertinent Pennsylvania law, per *Kulzer Roofing, see* page 705 *supra,* has considered necessary to create an express trust.

We therefore conclude that the Debtor's indebtedness to Options is not nondischargeable pursuant to § 523(a)(4).

4. ALTERNATIVELY, OPTIONS HAS RELEASED THE DEBTOR FROM ANY FIDUCIARY OR OTHERWISE NONDISCHARGEABLE OBLIGATION IN EXECUTING THE WORK OUT

■ Options has offered no substantive evidentiary response to the merits of the

Debtor's contention that, in executing the Work Out, Options released the Debtor from any prior nondischargeable debts which he had to it. Instead, Options has relied solely on the argument that *res judicata* or collateral estoppel arising from the PSX Decision or Judge Waldman's Memorandum bars the Debtor from raising this argument.

 Clearly, there is no *res judicata* effect from these decisions, because the issue of bankruptcy dischargeability was not in issue there. *See Brown v. Felsen,* 442 U.S. 127, 134–39, 99 S.Ct. 2205, 2211–13, 60 L.Ed.2d 767 (1979); and *In re Bergman,* 103 B.R. 660, 662 (Bankr.E.D.Pa.1989). However, it is equally clear that a bankruptcy court, in deciding a dischargeability proceeding, could properly give collateral estoppel effect to a prior decision on the merits of the underlying claim rendered by a non-bankruptcy court. *See Grogan v. Garner,* 498 U.S. 279, 284–85, 111 S.Ct. 654, 658–59, 112 L.Ed.2d 755 (1991); and *Bergman, supra,* 103 B.R. at 662–63.

Before analyzing the potential collateral estoppel effect of the Decision and the Memorandum, we find it helpful to ascertain precisely what effect the validity of the release has on the disposition of the Proceeding, especially since neither of the parties' posttrial submissions appear to do so. We believe that the effect of the release, from the Debtor's perspective, is to eliminate all of the claims which Options had against him prior to the execution of the Work Out, and replace them with the Work Out as the sole obligation. The Work Out is then properly viewed as a novation of the Debtor's prior obligations to Options. *See In re West,* 157 B.R. 626, 629 (N.D.Ill.1993); and *In re Bell,* 97 B.R. 208, 213 (Bankr.E.D.Pa.1989).

This characterization of the effect of the release language in the Work Out appears consistent with the law of Pennsylvania regarding the effect of releases, as was thusly stated by us in *In re FRG, Inc.,* 121 B.R. 451, 457 (Bankr.E.D.Pa.1990):

> The law of Pennsylvania, ... does not suggest niggardly treatment of releases:
> "Pennsylvania law is clearly that where the parties manifest an intent to settle all accounts, the release will be given full effect even as to unknown claims (footnote omitted)."

*Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 896 (3d Cir.1975).

> "Under Pennsylvania law, a signed release is binding upon the parties unless executed and procured through fraud, duress, accident, or mutual mistake. *Id.* at 892, citing *Kent v. Fair,* 392 Pa. 272, 140 A.2d 445 (1958), *see also Commonwealth of Pennsylvania v. Flaherty,* 547 F.Supp. 172 (W.D.Pa.1982). The natural and ordinary meaning of the language of the release demonstrates the intention of the parties and will prevail unless one of the parties unequivocally proves that the release is invalid. *Sears, Roebuck & Co. v. Jardel Co.,* 421 F.2d 1048, 1054 (3d Cir.1970); *Young v. Robertshaw Controls Co.,* 430 F.Supp. 1265, 1268 (E.D.Pa.1977); *Frank v. Volkswagenwerk, A.G. of West Germany,* 382 F.Supp. 1394, 1400 (E.D.Pa.1974), *modified on appeal,* 522 F.2d 321 (3d Cir. 1975). The party alleging that the release is invalid has the burden of proving its invalidity. *Young,* 430 F.Supp. at 1268, *Hohlweiler v. Pennsylvania R.R. Co.,* 294 F.Supp. 1377, 1381 (E.D.Pa. 1969), *aff'd,* 436 F.2d 1382 (3d Cir.1971), *cert. denied,* 404 U.S. 884, 92 S.Ct. 220, 30 L.Ed.2d 167 (1971)."

*Reed v. Smithkline Beckman Corp.,* 569 F.Supp. 672, 674–75 (E.D.Pa.1983). *Accord, e.g., Popovich v. Empire Beauty Schools, Inc.,* 567 F.Supp. 1440, 1442 (E.D.Pa.1983); *Dickun v. United States,* 490 F.Supp. 136, 138 (W.D.Pa.1980); *Wolbach v. Fay,* 488 Pa. 239, 424, 412 A.2d 487, 488 (1980); and *Brill's Estate,* 337 Pa. 525, 527–28, 12 A.2d 50, 52 (1940).

The logical interpretation of the broad release contained in the Work Out, having been negotiated for several months by equally knowledgeable and sophisticated parties both of which were represented by counsel, is, indeed, that the obligations of the Debtor are confined to those recited in the Work Out in the future.

This characterization of the Work Out is also very significant, because it then has the

effect of discharging the Debtor's prior obligations, including the fiduciary aspects of these obligations. *Id.* And it is the prior obligations of the Debtor which were allegedly tainted by the Debtor's actions in violations of 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). If the release is valid, it therefore will not eliminate the Debtor's obligations to Options. The obligations articulated in the Work Out remain. However, its effect is to replace the Debtor's allegedly § 523(a)–tainted obligations with obligations based solely on the Work Out. The Complaint does not allege any causes of actions under § 523(a) against the Debtor as a result of his conduct in entering into the Work Out. Therefore, if the release is valid, the Debtor will have replaced previous potentially nondischargeable obligations with dischargeable obligations. *Accord West, supra,* 157 B.R. at 629–30.

In order to determine whether the arbitration Decision and/or the Memorandum have collateral estoppel effect as to the validity of the release contained in the Work Out, it is necessary to consider the criteria for application of collateral estoppel in dischargeability litigation generally. Addressing this issue in *Bergman, supra,* 103 B.R. at 663, we stated as follows:

> [c]ollateral estoppel, or issue preclusion, applies in dischargeability proceedings, as in any other legal actions, if and only if the following four requirements are met as to the issue in question:
>
> " '(1) the issue sought to be precluded must be the same as involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.' *Matter of Ross,* 602 F.2d 604, 606 (3d Cir.1979), quoting *Haize v. Hanover Ins. Co.,* 536 F.2d 576, 579 (3d Cir.1976)."

*In re Gaebler,* 88 B.R. 62, 65–66 (E.D.Pa. 1988).

▬ The fact that the Decision is an administrative, rather than a judicial, adjudication does not in itself bar its collateral estoppel effect. *Cf. In re Westbrook,* 123 B.R. 728, 731–33 (Bankr.E.D.Pa.1991) (an administrative decision resulting from a proceeding in which basic due process requirements were satisfied is entitled to *res judicata* effect). However, the Decision is very short and contains very terse rationale in support of its result. Of particular import to the matter at issue, it nowhere discusses the issue of the validity of the release contained in the Work Out.

In its briefing, Options assures us that the release issue was prominently raised before the arbitrators by the Debtor, and, therefore, by implication, the issue of its validity must have been decided against the Debtor by the PSX arbitrators in rendering the Decision. However, we cannot be certain that the arbitrators even considered the issue, having no indications of same.

Moreover, it will be recalled that the release, if effective, not only eliminated all liability of the Debtor prior to its entry, but also created new liability based on the undertakings of the Debtor in the Work Out itself. The Decision appears to be a finding that the Debtor is liable for violation of its obligations under the terms of the Work Out, not for his pre-Work Out undertakings. If this is in fact the reasoning of the Decision, then the Decision it in no sense purports to determine that the release is invalid.

In light of the foregoing, it seems clear that the issue before this court—the validity of the release to effect a novation or a superseding of the Debtor's previous obligations to Options in the Work Out—was not precluded by the Decision, was not actually litigated in the PSX arbitration, was not determined in the Decision, and was not essential to the Decision. As a result, the Decision provides no collateral estoppel support to Options on the release issue.

▬ We next consider the collateral estoppel effect of Judge Waldman's Memorandum, the relevant portion of which, addressing the release issue, is quoted at pages 699–700 *supra.* We begin by observing that the Debtor's appeal from Judge Waldman's decision does not affect the finality of same for

*res judicata* or collateral estoppel purposes. *See Bergman, supra,* 103 B.R. at 668.

█ The difficulty which we have in applying collateral estoppel effect from the Memorandum to invalidate the release language in the Work Out is that, once again, as in the case of the Decision, we do not believe that the Memorandum repudiates the validity of the release. While it does at least briefly address the issue of the validity of the release, the relevant passage merely states that the effect of the release was not to unconditionally release the Debtor from liability. Rather, the liability arising from the Debtor's non-performance of the Work Out is found to exist. It is apparently on the basis of the obligations created in the Work Out that Judge Waldman affirms the Decision on this issue.

If anything, this passage reaffirms the validity of the release, as it appears to conclude that the Debtor's liability under the terms of the Work Out continues, not his pre-Work Out obligations.[6] The issue significant to this proceeding, *i.e.,* whether the alleged taint of the obligations is superseded by the Work Out, was apparently not litigated, not determined therein, and was not essential to the decision reflected in the Memorandum. Hence, the Memorandum has no adverse collateral estoppel effect on the Debtor's position that the release is a defense to Options' claims of non-dischargeability.

Therefore, assuming *arguendo* that the Debtor's pre-Work Out obligations to Options were nondischargeable, which is contrary to the conclusions reached at pages 43–56 *supra* in any event, we hold that the release contained in the Work Out would nevertheless have rendered these obligations dischargeable.

Hence, on two independent bases, we conclude that no portion of the obligations of the Debtor to Options be deemed nondischargeable.

**6.** This finding repudiates an argument, suggested by certain of Options' statements in its submissions, that the Work Out should be deemed voidable because it was induced by the Debtor's allegedly wrongful concealment of his withdrawals from MKI's accounts. First, we note that the mere fact that the Work Out is voidable does not

## E. CONCLUSION

An Order consistent with our conclusions reached in all of the foregoing discussions will be entered.

### ORDER

AND NOW, this 26th day of October, 1993, after a consecutive hearing and trial on September 23, 1993, regarding (1) the Objections of First Options of Chicago, Inc. ("Options") to the exemptions claimed by MANUEL KAPLAN ("the Debtor") in the Debtor's main case ("the Objections"); and (2) the above-captioned proceeding ("the Proceeding"), it is hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED in part and OVERRULED in part.

2. Options' Objection to the Debtor's claimed exemption of his New Jersey condominiums under Pennsylvania law is SUSTAINED. The Debtor is granted leave to amend his claimed exemption of this property in a manner not inconsistent with the within Opinion on or before November 5, 1993, or the said property will be deemed non-exempt.

3. Options' Objection to the Debtor's claimed exemption of his pension plan is OVERRULED, pending any determination or decision of the Internal Revenue Service ("the IRS"), prior to the entry of a Final Decree in this case, that the said pension plan does not qualify under the Internal Revenue Code ("the IRC"). If the IRS renders any such adverse determination prior to the expiration of the above-referenced timeframe, the Debtor shall inform Options of this ruling in writing within ten (10) days, and Options may request reconsideration of this court's within determination of exemption within twenty (20) days of service of any such notice.

render it void and hence subject to being ignored. *See In re Taylor,* 96 B.R. 584, 590 (Bankr.E.D.Pa.1989). However, more significantly, the Memorandum appears to reaffirm the validity of the Work Out, by basing the court's finding of liability on its terms only.

4. All other Objections of Options are OVERRULED.

5. Judgment is entered in favor of the Debtor and against Options in the Proceeding. It is therefore DECLARED that all of the Debtor's obligations to Options are dischargeable.